**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| SPARK CONNECTED, LLC, <br> KEN MOORE, EMANUEL STINGU, <br> And RUWANGA DASSANAYAKE, <br> <br> Plaintiffs and Counter-Defendants, <br> <br> v. <br> <br> SEMTECH CORPORATION, <br> <br> Defendant and Counter-Plaintiff. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> Case No. 4:18-cv-748-ALM-KPJ |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant and Counter-Plaintiff Semtech Corporation's ("Semtech") Motion for Preliminary Injunction (the "Motion") (Dkt. 14), to which Plaintiffs and Counter-Defendants Spark Connected, LLC ("Spark"), Ken Moore ("Moore"), Emanuel Stingu ("Stingu"), and Ruwanga Dassanayake ("Dassanayake") (collectively, "Counter-Defendants") filed a response (Dkt. 34), and Semtech filed a reply (Dkt. 92). In accordance with the provisions of 28 U.S.C. § 636(c), the parties consented to proceed before the undersigned "for the limited purpose of deciding Semtech's Motion for Preliminary Injunction." *See* Dkt. 162.

For the reasons explained below, Semtech's Motion (Dkt. 14) is **DENIED**.

### I. BACKGROUND

#### A. FACTUAL BACKGROUND

#### 1. Moore, Stingu, and Dassanayake's Employment at Semtech

Triune Systems, L.L.C. ("Triune") was a startup company operating in the wireless power technology industry. *See* Dkt. 101 at 1. Moore held an ownership interest in Triune and was employed as Vice President of Marketing and Applications. *See* Dkt. 77 at 2; Dkt. 97 at 3; Dkt.

1

101 at 2. Stingu was employed at Triune in a programming and engineering role. *See id.* On March 4, 2015, Semtech acquired Triune through a Purchase Agreement. *See* Dkt. 97 at 3; Dkt. 49-05. Under the terms of the Purchase Agreement, Moore received a portion of the sale proceeds. *Id.* Additionally, the Purchase Agreement included a provision that "owners" and "seller parties" would not compete with Semtech for five-years, beginning on the closing date, March 4, 2015. *See* Dkt. 49-05. After the acquisition, Moore and Stingu continued working on the development of wireless power technology for Semtech. *See* Dkt. 97 at 3; Dkt. 101 at 2. In August 2015, Semtech hired Dassanayake as a Senior Product Marketing Specialist, working on Semtech's wireless power projects. *See* Dkt. 79 at 2; Dkt. 99 at 2. As a condition of employment with Semtech, Moore, Stingu, and Dassanayake each signed an Employee Confidentiality Agreement and Proprietary Rights Assignment (together, the "Confidentiality Agreements"), in which they agreed not to use or disclose Semtech's "Confidential Information."[1] *See* Dkt. 97 at 3; Dkt. 49-06; Dkt. 49-07; Dkt. 49-08.

In May 2017, Semtech terminated Moore's employment. *See* Dkt. 97 at 4. Upon termination, Moore signed a Separation and General Release Agreement (the "Moore Separation Agreement"), in which Moore received severance and, in exchange, agreed to, *inter alia*, "continue to comply with the terms and conditions of employee confidentiality, trade secret, inventions

---

[1] "Confidential Information" is defined in the Confidentiality Agreements to include, but not be limited to, "[A]ny and all information relating to the Company's business or operations which is not generally known outside of the Company, or information entrusted to the Company by third parties, and includes information known to [the signor of the Confidentiality Agreement] as confidential or secret, or which [they] have reason to know or reasonably should know is confidential or secret. This information shall include, but not be limited to, trade secrets, technology, ideas, processes, products, improvements, developments, discoveries, inventions, design, manufacture or sale of the Company's products or services, computer hardware and software, business or marketing plans, the names and locations of employees, vendors, distributors and customers, equipment and product design and concepts, research and development, selling, marketing and any actual or contemplated trademark, service mark, trade name or patent or patent application. This information may be contained in materials such as contracts or agreements, compilations, prototypes, drawings, models, documents, reports, specifications, or may be in the nature of unwritten knowledge, techniques, devices, processes, practices, methods or know-how." *See, e.g.,* Dkt. 49-06 at 2.

2

assignment, or similar agreements. . . ." *See* Dkt. 49-11.

On May 29, 2019, without giving prior notice to his supervisors, Stingu took time off work, allegedly to marry his long-time partner. Dkt. 101 at 3–4. Stingu asserts entitlement to the time off, in part, because he had accrued twenty-two vacation days. *See* Dkt. 101 at 3–4. On May 30, 2017, Semtech contacted Stingu to inquire when Stingu planned to return, *see* Dkt. 94-6; Dkt. 94-7, to which Stingu stated he was uncertain. *See* Dkt. 94-2. On June 12, 2017, before Stingu returned to work, Stingu's employment with Semtech was terminated. Dkt. 101 at 6.[2] After Stingu's termination, Stingu returned several devices containing Semtech's information, including a laptop, hard drive, flash drive, and smartphone. *See* Dkt. 101 at 7. Stingu did not, however, give Semtech his personal solid-state drive, which Stingu had used in his Semtech laptop. *See id.* Counsel for Stingu and Semtech "engaged in months of back-and-forth communications about a protocol for inspecting" the solid-state drive without reaching an agreement. *See id.* Thereafter, Stingu refused to provide the drive for Semtech's inspection. *See id.* Due to the dispute over the solid-state drive, no post-termination agreements were reached between Semtech and Stingu. *See id.* After Stingu's termination, Stingu contacted Moore regarding employment. *See* Dkt. 101 at 8.

Throughout 2017, other Semtech employees who worked in Semtech's wireless power department were terminated or resigned, and over time, the department shrank. *See* Dkt. 208. For example, after Moore and Stingu were terminated, Semtech did not hire employees to replace them. *See, for example,* Dkt. 99 at 3. Dassanayake, on behalf of Semtech, cancelled a customer contract to provide wireless power technology because Semtech's current staff could not complete Semtech's obligations under the contract. *See id.*; *see also* Dkt. 99 at 6–9 (Dassanayake alleges he was informed Semtech was exiting the wireless power business).

---

[2] The parties dispute whether Stingu voluntarily resigned or Semtech terminated his employment. *Compare* Dkt. 14 at 9 *with* Dkt. 101 at 6.

Between September 28, 2017, and January 2018, Dassanayake sent emails containing Semtech customer contact information and PowerPoint presentations to his personal Hotmail account. *See* Dkt. 99 at 6; Dkt. 14 at 15–16; Dkt. 50-1; Dkt. 50-3; Dkt. 95-12. On January 23, 2018, Semtech terminated Dassanayake. *See* Dkt. 99 at 8. After Dassanayake's termination, he entered into a Separation and General Release Agreement (the "Dassanayake Separation Agreement") in which he accepted severance in exchange for, *inter alia*, ongoing confidentiality obligations. *See* Dkt. 51-06.

**2. Formation of Spark**

In May 2017, Moore began working with a business partner to develop a connected smartwatch company under the business name of "Spark." *See* Dkt. 97 at 7–8. Moore also explored working with Infineon Technologies AG ("Infineon"), a wireless charging company. *See id*. After Stingu's termination, Stingu began working with Moore at Spark. *See* Dkt. 101 at 8. Ultimately, Moore and Stingu decided not to enter the connected smartwatch industry; thereafter, Spark's owners and employees split the company. *See* Dkt. 97 at 11–12. Moore and Stingu retained the "Spark" company name and began working on wireless power in earnest, while the remaining partners exited the business. *See id*. Spark officially formed as an LLC in September 2017. *See* Dkt. 97 at 11.

Prior to Dassanayake's termination from Semtech, Dassanayake's name was listed as a member of Spark on Spark's LLC registration, as well as certain marketing materials.[3] *See* Dkt. 97 at 11; Dkt. 99 at 5. Although the parties dispute when Dassanayake began working with Spark, Dassanayake admits to joining Spark after his termination from Semtech. *See* Dkt. 99 at 1.

---

[3] Dassanayake disputed any knowledge that his name was included in the Spark materials prior to his termination from Semtech. *See* Dkt. 99 at 5. Moore also testified that Dassanayake was not informed that his name was included on the Spark materials.

Semtech learned of Spark's work in wireless power as early as November or December of 2017, from a Semtech customer who was working with Spark. *See* Dkt. 97 at 14; Dkt. 95-8 at 11. Around the same time, Semtech warned another wireless power company about the "legal risk" in working with Spark. *See id*.

In March 2018, approximately nine (9) months prior to requesting an injunction in this case, Spark and Semtech both attended the Applied Power Electronic Conference ("APEC"), at which Moore demonstrated wireless power prototypes. *See* Dkt. 97 at 13; *see also* Dkt. 184 at 57. Moore's demonstration was witnessed by Semtech employees. *See id*.; *see also* Dkt. 184 at 130 (photos taken by Semtech employees of the demonstration led Semtech employees to conclude Spark had a fully functional product at APEC). Moore testified that Spark's wireless power prototypes at APEC were still in the testing phase and were not yet ready for use by customers. *See also* Dkt. 97 at 13 ("At the time of this demonstration, the only code for wireless charging that Stingu had written at Spark was very rudimentary."). Semtech alleges that Moore "used the exact same demonstration as Semtech" to demonstrate Spark's wireless charging products at APEC. *See* Dkt. 16 at 11; Dkt. 14 at 18.

Following APEC, on May 31, 2018, Semtech internally discussed warning a key Semtech customer "not to engage with Spark Connected" because of "IP infringement." *See* Dkt. 95-19; Dkt. 95-20. Thereafter, on August 8, 2018, Spark sent a cease-and-desist letter to Semtech, demanding Semtech cease from making false statements regarding Spark and/or Moore. *See* Dkt. 94-6; Dkt. 97 at 14–15. On September 4, 2018, Semtech sent a cease-and-desist letter to Spark, alleging that Moore was prohibited from working in the wireless power industry. *See* Dkt. 95-21.

**B. PROCEDURAL HISTORY**

Counter-Defendants filed suit on October 17, 2018, "seeking a declaratory judgment that [Spark, Moore, Stingu, and Dassanayake] have not breached any agreements with [Semtech] and/or misappropriated trade secrets belonging to [Semtech]." *See* Dkt. 1. Semtech filed an Answer, which included affirmative defenses and counterclaims. *See* Dkt. 7. Semtech subsequently filed an Amended Answer, Affirmative Defenses, and Counterclaims (Dkt. 131). Semtech asserts counterclaims for: (1) violation of Federal Defend Trade Secrets Act, 18 U.S.C. § 1835, against all Counter-Defendants; (2) violation of the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code § 134A, against all Counter-Defendants; (3) breach of contract against Moore, pursuant to the Purchase Agreement; (4) breach of contract against Dassanayake, pursuant to "at least two separate agreements with clauses relating to the Trade Secrets and confidential information;" (5) breach of contract against Stingu, pursuant to an agreement signed "[d]uring the course of his employment with Semtech . . . relating to the Trade Secrets and confidential information;" and (6) breach of fiduciary duty under Texas common law against Dassanayake and Stingu.[4] *See* Dkt. 131.

On November 21, 2018, Semtech filed the instant Motion for Preliminary Injunction. *See* Dkt. 14. Semtech asserts the Motion for Preliminary Injunction is warranted pursuant to its claims for: (1) breach of contract against Moore; (2) breach of contract under the Confidentiality Agreements against Moore, Stingu, and Dassanayake; and (3) misappropriation of trade secrets by all Counter-Defendants.[5] *See* Dkt. 14. The parties subsequently filed an agreed proposed briefing

---

[4] The Court held the parties' Rule 16 Management Conference on August 28, 2019. *See* Dkt. 258. At the Rule 16 Management Conference, Semtech stated that, to the extent the Motion (Dkt. 14) seeks injunctive relief pursuant to any counter-claim which has subsequently been withdrawn, Semtech no longer seeks such relief. *See id.*
[5] While Semtech asserts Counter-Defendants misappropriated thirty-one protected trade secrets in total (*see* Dkt. 21), Semtech bases its Motion on only twelve trade secrets (the "Trade Secrets"). *See* Dkt. 14.

schedule, which the Court adopted (the "Briefing Schedule"). *See* Dkts. 30, 31. In accordance with the Briefing Schedule, Counter-Defendants filed a response on April 4, 2019 (Dkt. 92) and Semtech filed a reply on April 18, 2019 (Dkt. 122).[6] The Court held a two-day evidentiary hearing on May 29 and 30, 2019 (the "Hearing"). *See* Dkts. 157, 158. After the Hearing, the parties submitted additional evidence for the Court's consideration. *See, for example,* Dkts. 168, 170, 206, 208, 210, 229, 231.

## II. LEGAL STANDARD

A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted." *Gonannies, Inc. v. GoAuPair.com, Inc.*, 464 F. Supp. 2d 603, 607 (N.D. Tex. 2006) (citing *Mississippi Power and Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985); *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987)). Thus, "if a party fails to meet *any* of the four requirements, the court cannot grant the temporary restraining order or preliminary injunction." *Id.* "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.* Nevertheless,

---

[6] Both parties submitted extensive records regarding the Motion for Preliminary Injunction and the pending Motion for Partial Summary Judgment (Dkt. 72) filed by Counter-Defendants. Copies of these records were provided to the Court at the Hearing. *See* Dkt. 177.
 The Court notes that the citations in these records are confusing, inconsistent, and difficult to follow. As addressed at the parties' Rule 16 Management Conference, the parties are directed that all future citations should be made to docket entries and not to either the exhibit numbers assigned by the parties or simply the declarant's name.

a movant "is not required to prove its case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1985) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). The decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

### III. ANALYSIS

Semtech argues it is entitled to injunctive relief on the basis of: (1) Semtech's claim for breach of the Purchase Agreement against Moore; (2) Semtech's claim for misappropriation of the Trade Secrets; and (3) Semtech's claim for breach of contract against all Counter-Defendants premised on breach of the Confidentiality Agreements. *See generally* Dkt. 14. Because Semtech has not established it would be irreparably harmed in the absence of injunctive relief, the Motion is **DENIED**.

#### A. RULE 65(d)

Semtech's Motion for Preliminary Injunction seeks a court order, requiring:

> All Counter-Defendants, as well as their employers, agents, employees, and all persons acting on concert with them, are enjoined and restrained from using, copying, publishing, disclosing, transferring, or selling Semtech's trade secrets identified in Semtech's Trade Secret Identification as of November 21, 2018, or other Semtech confidential and proprietary information, and from obtaining any commercial advantage or unjust enrichment from their misappropriation of Semtech's trade secrets or other confidential and proprietary information[.]

Dkt 14-1 at 2 (Semtech's proposed Preliminary Injunction Order).

Semtech's Trade Secrets are not defined in the Motion for Preliminary Injunction. *See generally* Dkt. 14. Rather, Semtech separately filed a Trade Secret Identification as of November 21, 2018. *See* Dkt. 21. Semtech seeks to enjoin Counter-Defendants from the misappropriation of

8

twelve of the asserted Trade Secrets.[7] *See* Dkt. 122 at 12 (discussing Trade Secrets 1, 4, 25–26), 14 (discussing Trade Secrets 10, 19–21, 23–24, 28–29), 15.

First, Counter-Defendants argue the Court cannot grant the injunctive relief requested because Semtech failed to comply with Federal Rule of Civil Procedure 65(d), as the proposed injunctive relief fails to describe the requested relief with the necessary specificity or in the required form. *See* Dkt. 92 at 20–20. Semtech's Motion for Preliminary Injunction impermissibly relies on and refers to the Trade Secret Identification (Dkt. 21), filed separately. Rule 65(d)(1)(C) requires injunctions and restraining orders to "describe in detail—and not by referring to the complaint or other document—the act or acts restrained or required." In this case, neither the Motion for Preliminary Injunction (Dkt. 14), nor the Proposed Order (Dkt. 14-1), adequately defines the activities which Semtech seeks to enjoin.

Second, even if the Court were to reform the Motion for Preliminary Injunction and Proposed Order to include the Trade Secrets, the Trade Secrets, as drafted, are overbroad, vague, and lack the specificity required to support injunctive relief. *See, for example,* Dkt. 21 at 5 (describing Trade Secrets 20, 21), 7 (describing Trade Secrets 23, 24), 9 (describing Trade Secrets 28, 29). For example, Semtech asserts that its "business strategies for its solutions for wireless charging of multiple devices at once" constitute a Trade Secret, followed by a non-exhaustive list of the types of business strategies it seeks to protect. *See* Dkt. 21 at 6 (describing Trade Secret 20); *see also* Dkt. 21 ("Semtech is currently investigating its disclosure obligations regarding [the] entity [described in this Trade Secret] and will provide the entity's name shortly."). During the Hearing, the Court determined the Trade Secrets were inactionably vague and overbroad. *See* Dkt.

---

[7] Semtech's Trade Secret Identification is filed under seal. *See* Dkt. 21. Counter-Defendants assert they initially did not have access to the full list of Trade Secrets, *see* Dkt. 92; however, at the Hearing, Counter-Defendants acknowledged they have since received the full text of the Trade Secrets (Dkt. 21).

185 at 336–37. To date, Semtech has not filed any amendment to the Trade Secret Identification.

It is improper to require either the Court or Counter-Defendants to speculate about the meaning of the Trade Secrets at the heart of Semtech's Motion for Preliminary Injunction. *See* FED. R. CIV. P. 65(d). Injunctive relief cannot issue on the basis of Trade Secrets which are inadequately defined.

### A. IRREPARABLE HARM

Semtech argues it will face irreparable harm if Counter-Defendants are not enjoined because: (1) the Confidentiality Agreements signed by Moore, Stingu, and Dassanayake make injunction an available remedy;[8] and (2) Semtech will suffer lost business and loss of goodwill. *See* Dkt. 14 at 32–33. Semtech bears the burden to establish that it will suffer irreparable harm, and to do so "must demonstrate the threat of irreparable harm by independent proof or no injunction may issue." *Pruvit Ventures, Inc. v. Forevergreen Int'l LLC*, 2015 WL 9876952, at *3 (E.D. Tex. Dec. 23, 2015), *report and recommendation adopted* 2016 WL 231160 (E.D. Tex. Jan. 19, 2016) (citing *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989)). "Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985); *see also Mike's Train House, Inc. v. Broadway Ltd. Imports, LLC*, 708 F. Supp. 2d 527, 532 (D. Md. 2010) ("Mere speculation about possible market share losses is insufficient evidence of irreparable harm."). Moreover, "a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). Accordingly, Semtech must demonstrate that

---

[8] Semtech also argues that Spark misappropriated the Trade Secrets and Moore, Dassanayake, and Stingu breached the Confidentiality Agreements. Semtech argues it is therefore entitled to a presumption of irreparable harm. *See, for example,* Dkt. 122 at 18. Because the Trade Secrets are inadequately defined, the Court finds Semtech has failed to establish it is entitled to this presumption and declines to address the merits of Semtech's contentions regarding any alleged breaches.

monetary damages are an insufficient remedy and that their alleged harms are not just possible, but likely. *Id.*; *see also Janvey*, 647 F.3d at 585.

### 1. Confidentiality Agreements

Semtech argues it is entitled to a presumption of irreparable harm pursuant to the terms set forth in the Confidentiality Agreements. *See* Dkt. 14 at 31. The Confidentiality Agreements state:

> <u>Injunctive Relief</u>. I agree that all of my obligations and promises contained in this Agreement are of a unique and intellectual character which gives them a particular value to the Company. Therefore, I acknowledge that a breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to the Company for which the Company will have no adequate remedy at law. Accordingly, I agree that the company shall be entitled to obtain injunctive relief and/or a decree for specific performance as well as such other relief as a court may deem proper, including but not limited to monetary damages, if appropriate.

*See, for example,* Dkt. 49-06; Dkt. 49-07; Dkt. 49-08.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). Even where parties agree irreparable harm would result, the movant must establish money damages are an inadequate remedy. While the Confidentiality Agreements state that any breach will result in "irreparable and continuing damage," the terms of the Confidentiality Agreements alone do not address why money damages would not adequately compensate Semtech for any harm caused by Counter-Defendant's alleged activities. *See Gonannies*, 464 F. Supp. 2d at 609 (denying preliminary injunction where plaintiffs failed to introduce evidence to demonstrate that any threat of irreparable injury could not be adequately compensated by monetary damages). The Court finds the terms of the Confidentiality Agreements insufficient to support a finding of irreparable harm.[9]

---

[9] Even if Semtech were entitled to a presumption of irreparable harm, a presumption of irreparable harm alone is insufficient to establish that a party is entitled to injunctive relief. *See infra* p.15–16.

**2. Lost Business and Loss of Good Will**

Semtech asserts it has lost, and will continue to lose, business, business relationships, and good will as a result of Spark's acts. *See* Dkt. 14 at 31–33. Semtech directs the Court to similarities in the parties' demonstration methods, solicitation of Semtech customers, and offers to undercut Semtech's pricing. *See id*. In order to establish lost business and loss of good will as the foundation for irreparable harm, Semtech must demonstrate concrete and corroborated harm which cannot be cured with money damages. *See Pruvit*, 2015 WL 9876952, at *5 (*citing Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 30 (D.D.C. 2010)). "Proof of lost market share and lost sales alone are insufficient to establish irreparable harm. . . ." *FieldTurf USA, Inc. v. Astroturf, LLC*, 725 F. Supp. 2d 609, 617 n.3 (E.D. Mich. 2010) (citing *Automated Merch. Sys. v. Crane Co.*, 357 F. App'x 297, 301 (Fed. Cir. 2009)); *see also DFW Metro Line Services v. Sw. Bell Telephone Co.*, 901 F.2d 1267, 1269 (5th Cir. 1990), *cert denied*, 498 U.S. 985 (1990) (lost goodwill of a business operated over a short period of time is usually compensable in money damages); *Pruvit*, 2015 WL 9876952, at *6 (collecting cases). Price erosion alone is insufficient to establish irreparable harm. *See Pruvit*, 2015 WL 9876952, at *4 (collecting cases).

While there is evidence Spark markets its products to some of the same customers as Semtech, these marketing efforts do not establish irreparable harm. Semtech argues it competes with Spark because both Semtech and Spark sell wireless power solutions; however, this contention is not supported by the evidence. The Court heard testimony that customers who purchase wireless power reference designs like those sold by Semtech do not also purchase custom designed wireless power solutions like those of Spark. Simon Brown ("Brown") testified that Semtech primarily offers off-the-shelf reference designs. Brown testified that Semtech's business model has evolved since the acquisition of Triune, such that Semtech offers primarily reference

designs, but no longer develops new reference designs in-house and does not offer firmware (although Semtech continues to license existing firmware to outside firms).[10] *See* Dkt. 184 at 158; Dkt. 185 at 37–38. In contrast, Moore and Stingu presented compelling testimony that Spark primarily designs and engineers custom products for its customers and business partners in-house.

Additionally, there is extensive evidence Semtech does not presently employ many, if any, programmers or engineers developing new or custom wireless power solutions. Brown testified that after Triune was acquired, the wireless power group at Semtech employed three employees who developed firmware for wireless power and source code. Stingu was one of those employees and was considered an instrumental part of the team. Brown's testimony further revealed that after Moore and Stingu left Semtech, Semtech did not hire engineers to replace them. *See also* Dkt. 99 at 3 (During the Consumer Electronics Show in January 2018, Dassanayake learned Semtech did not plan to invest in wireless power and Dassanayake ultimately needed to contact a customer to cancel a sale because Semtech could not deliver. "Without Stingu, there was no one left at Semtech who could write the source code necessary, test or validate a wireless power solution to meet [Customer's] needs."); *see also* Dkt. 99 at 6–7, 8–9 (during Dassanayake's termination, he was allegedly informed Semtech was exiting the wireless power business). The testimony established that since Moore and Stingu's termination, additional key employees in the Triune/Semtech product development have also left the company and were not replaced. *See generally* Dkt. 208 (describing employees who left Semtech and were not replaced and the role of current Semtech employees). This evidence tends to indicate Semtech was no longer interested in the wireless power market or had shifted the focus of its business away from that segment which was previously

---

[10] Since suit was filed, Semtech has formalized a new business relationship with Neosen. *See infra* p. 13–14. The record is unclear what, if any, changes the Neosen partnership will have on Semtech's competitiveness in the custom wireless power market.

competed in by Triune.

Semtech argues, *inter alia*, it would be irreparably harmed because the two companies now compete in the same product category due to a firmware license agreement between Semtech and Neosen, dated June 17, 2019 (the "Neosen Agreement"). *See* Dkt. 226 at 2; Dkt. 231-1. The Neosen Agreement represents a recent change in Semtech's business model, memorialized after the Preliminary Injunction hearing. *See* Dkt. 231. According to the Neosen Agreement, Semtech will receive payments, and in exchange, Semtech will license previously created firmware and source code, as well as any code or firmware developed in the future, for use by Neosen. *See* Dkt. 231-1. On the record before the Court, it appears Spark and Semtech still do not compete for the same customers in the same niche of the wireless power market. *See also* Dkt. 208 at 2. Thus, any harm Semtech suffers as a result of Spark's sales to the same target group of customers is speculative and optimistic. Additionally, at least in part because of Semtech's changed business model, including the voluntary termination of most, if not all, of Semtech's programmers working on wireless power, the Court cannot find Semtech would be irreparably harmed.

### 3. Delay in Seeking Injunctive Relief

Spark further argues Semtech delayed in seeking injunctive relief, thus Semtech failed to establish it suffered irreparable harm. Specifically, Spark argues Semtech delayed in seeking injunctive relief for more than a year after learning that Moore and Stingu were involved with Spark, and more than eight months after witnessing Spark's product demonstration at APEC. *See* Dkt. 92 at 23. Semtech argues it did not unreasonably delay seeking injunctive relief because in 2017, when Counter-Defendants allegedly began the conduct at the base of this dispute, Semtech merely had suspicions of wrongdoing, not proof. *See* Dkt. 122 at 16–17 (citing *Realpage, Inc. v. Enterprise Risk Control, LLC*, 2017 WL 3313729 (E.D. Tex. Aug. 3, 2017); *ADT, LLC v. Capital*

*Connect, Inc.*, 145 F. Supp. 3d 671 (N.D. Tex. 2015)); *see also* Dkt. 184 at 57–58 (At the hearing, counsel for Semtech stated, "Semtech wasn't willing to act [as of seeing Spark at APEC], but definitely was paying very close attention to what they were doing."). Rather, Semtech argues it promptly acted to protect itself by sending Spark a cease and desist letter in September 2018, after Semtech learned Dassanayake had solicited a client on behalf of Spark in August 2018. *See* Dkt. 122 at 16–17; Dkt. 184 at 57–58.

> The law is well-established that:
>
> [D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief. Evidence of an undue delay in bringing suit may be sufficient to rebut the presumption of irreparable harm.

*Wireless Agents, L.L.C. v. T-Mobile USA, Inc.*, 2006 WL 1540587, *3 (N.D. Tex. June 6, 2006) (internal citations and punctuation omitted). Courts have found that the expiration of several months between discovering an act of breach or infringement and seeking injunctive relief should factor into the court's analysis and could serve to rebut a claim of irreparable harm. *See Pruvit*, 2015 WL 9876952, at *8 (collecting cases and finding undue delay where movant delayed approximately five months); *Galvotec Alloys, Inc. v. Gaus Anodes Int'l,* LLC, 2014 WL 2918581, at *3 (S.D. Tex. June 26, 2014) (holding a multiple year delay in seeking injunctive relief "counsels against finding irreparable injury would result"); *Innovation Ventures, LLC v. Ultimate Lifestyles, LLC*, 2009 WL 1490588, at *3 (E.D. Tex. May 27, 2009) (finding nine-month delay between learning of infringing conduct and injunctive relief to be undue delay where plaintiff provided no explanation for the delay); *Ellipse Commc'ns, Inc. v. Caven*, 2009 WL 497268, at *2 (N.D. Tex. Feb. 26, 2009) (denying an injunction because a seven-month delay, with no excuse, rebuts the presumption of irreparable harm); *Gonannies*, 46 F. Supp. 2d at 609 (six-month wait before

seeking injunctive relief constituted undue delay even where the movant raised a presumption of irreparable harm).

Spark argues that Semtech had long known of Spark's role in wireless power prior to seeking injunctive relief, based on the following events:

- In November and/or December of 2017, Semtech communicated with other wireless power companies about the "legal risk" in working with Spark. *See* Dkt. 97 at 14; *See* Dkt. 95-8 at 11.

- In January 2018, Semtech believed Moore was in breach of a non-compete obligation because "clearly he [was] set up in competition with Semtech." *See* Dkt. 75-3 at 12; Dkt. 184 at 120.

- In February 2018, an email from Stingu was inadvertently sent to Dassanayake's old Semtech email address. *See* Dkt. 75-3 at 12–13.

- In March 2018, Semtech employees saw Moore demonstrating wireless power technology at APEC. *See* Dkt. 97 at 14 (At APEC, Moore spoke to two Semtech employees, in the booth where Moore presented wireless power using similar demonstrative techniques to those employed by Semtech); *see also* Dkt. 184 at 52.

- Shortly after Dassayake's termination, Semtech learned that Moore, Stingu, and Dassanayake were working together at Spark. *See* Dkt. 92 at 16; *see also* Dkt. 75-3 at 12–13, 17.

- On May 31, 2018, Semtech discussed warning Magway, a Semtech customer, "not to engage with Spark Connected" because of "IP infringement." *See* Dkt. 95-19 (May 31, 2018 internal Semtech email, including plan to "[w]arn Magway not to engage with Spark Connected or other solution provider (IP infringement)."); *see*

16

*also* Dkt. 95-20.

- On August 8, 2018, Spark sent a cease-and-desist letter to Semtech demanding Semtech cease from making false statements regarding Spark and/or Moore. *See* Dkt. 94-6; Dkt. 97 at 14–15.

- On September 4, 2018, Semtech sent a cease-and-desist letter to Spark alleging Moore was prohibited from working in wireless power. *See* Dkt. 95-21.

- On October 17, 2018, Spark, Moore, Stingu, and Dassanayake were the first to file suit for declaratory judgment against Semtech. *See* Dkt. 1.

- On November 21, 2018, Semtech filed the instant Motion more than a month after being sued.[11] *See* Dkt. 14. On November 30, 2018, the parties submitted the agreed Briefing Schedule, which rendered Semtech's Motion for Expedited Discovery moot. *See* Dkt. 30 at 2. The Briefing Schedule further requested a hearing on the Motion approximately five months later, seeking a setting after April 29, 2019. *See* Dkt. 30 at 1–4.

The instant Motion for injunctive relief was filed on November 21, 2018, nine (9) months after Semtech saw Moore representing wireless power technology at APEC, eight (8) months after Semtech leadership concluded Stingu was using stolen code to develop wireless technology at Spark, and only *after* suit was filed by Counter-Defendants. *See* Dkt. 14; Dkt. 99 at 3, 4; Dkt. 75-3 at 16–18. This delay raises a presumption against irreparable injury.

Semtech argues that no presumption arises because it was diligently investigating the law and facts surrounding any breach. *See* Dkt. 122 at 16. The Court finds Semtech's argument unpersuasive. If the alleged harms to Semtech's business were indeed as detrimental as Semtech

---

[11] The Court further notes that under the terms of the Purchase Agreement, the five-year limitation on competition by "seller parties," including Moore, expires on March 4, 2020. *See* Dkt. 49-05.

17

asserts, Semtech should have sought injunctive relief as soon as practicable after learning of the acts which Semtech argues constitute breach of the Purchase Agreement and/or Confidentiality Agreements. *See* Dkt. 184 at 57. While Semtech asserts the cease-and-desist letter diligently followed on the heels of discovering Dassanayake's solicitation of Semtech's customers, this argument is belied by the timeline of events before the Court. The instant Motion was filed approximately nine (9) months after Semtech employees witnessed Moore engage in the same type of conduct at APEC. Moreover, unlike the parties in *Realpage* and *ADT*, Semtech does not assert Spark prevented Semtech from discovering the nature of Spark's business or Moore, Dassanayake, or Stingu's involvement therein. *See Realpage*, 2017 WL 3313729, at *4 (the plaintiff's delay was not unreasonable because the defendants provided an adequate alternative explanation for conduct and no evidence was provided until one week prior to plaintiff filing suit). To the contrary, Spark's marketing efforts at APEC were both public and known to Semtech. Nor does Semtech provide a reasonable explanation for the delay or establish that the majority of the allegedly damaging conduct occurred shortly before injunctive relief was sought. *See ADT*, 145 F. Supp. 3d at 698–99 (finding plaintiff provided a reasonable explanation for the delay and the majority of the customer complaints which formed the basis for suit arose in the year prior to suit).

In all, Semtech's delay in requesting injunctive relief, without an adequate explanation, leads the Court to conclude that Semtech suffers no irreparable harm which could not be remedied by money damages. Therefore, the Court finds Semtech has not demonstrated substantial threat of irreparable harm necessary to satisfy the requirements for a preliminary injunction.

Spark's failure to establish irreparable injury requires the Court to deny the Motion for Preliminary Injunction. Therefore, the undersigned declines to consider arguments concerning the additional elements necessary to establish entitlement to a preliminary injunction.

## IV. CONCLUSION

"A preliminary injunction is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *Carlucci*, 862 F.2d at 1211. The injunctive relief sought in this case is particularly drastic, in that Semtech seeks to, in effect, shutter Spark's operation, as well as terminate the employment of Moore, Stingu, and Dassanayake, for a period of thirty-three months after entry of an injunction. *See* Dkt. 14-1. Based on the foregoing, Semtech has not satisfied the heavy burden of demonstrating it faces a substantial threat of irreparable harm. Accordingly, Semtech's Motion for Preliminary Injunction (Dkt. 14) is **DENIED**.

**IT IS SO ORDERED**.
**SIGNED this 10th day of September, 2019.**

_____
KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE