IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| **SPARK CONNECTED, LLC,** | § | |
| **KEN MOORE, EMANUEL STINGU,** | § | |
| **And RUWANGA DASSANAYAKE,** | § | |
| | § | |
| **Plaintiffs and Counter-Defendants,** | § | |
| | § | |
| **v.** | § | **Case No. 4:18-cv-748-KPJ** |
| | § | |
| **SEMTECH CORPORATION,** | § | |
| | § | |
| **Defendant and Counter-Plaintiff.** | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant and Counter-Plaintiff Semtech Corporation's ("Semtech")

Motion to Dismiss, or in the Alternative for Partial Summary Judgment of, Spark Connected,

LLC's ("Spark") Claims for Business Disparagement and Tortious Interference (the "Motion")

(Dkt. 299), to which Plaintiff and Counter-Defendant Spark filed a response (Dkt. 310), Semtech

filed a reply (Dkt. 320), and Spark filed a notice of supplemental authority (Dkt. 331). On

September 1, 2020, the Court heard oral argument on the Motion (the "Hearing"). *See* Dkt. 332.

For the reasons explained below, Semtech's Motion (Dkt. 299) is **GRANTED**.

## I.        BACKGROUND

Plaintiffs Ken Moore, Emanuel Stingu, and Ruwanga Dassanayake (collectively,

"Individual Plaintiffs") are all former employees of Semtech and current employees of Spark. *See*

Dkt. 289 at 4. At different points in time, Individual Plaintiffs and Semtech entered into various

agreements, including a covenant not to compete agreement, a non-solicitation agreement, and

multiple confidentiality agreements. *See* Dkt. 1 at 3–4; Dkt. 77-1 at 57–58; Dkt. 289 at 5. After his

separation from Semtech, Ken Moore formed Spark and, shortly thereafter, Emanuel Stingu and

Ruwanga Dassanayake separated from Semtech and joined Spark, where they all currently develop and provide wireless power solutions. *See* Dkt. 77 at 7–12. On October 17, 2018, Spark and Individual Plaintiffs (collectively, "Plaintiffs") filed suit, "seeking declaratory judgment that Plaintiffs have not breached any agreements with [Semtech] and/or misappropriated trade secrets belonging to [Semtech]." Dkt. 1 at 1.

On November 16, 2018, Semtech answered Plaintiffs' Complaint and asserted seven (7) counterclaims (the "Counterclaims"), including misappropriation of trade secrets, breach of contract, breach of fiduciary duty, and tortious interference. *See* Dkt. 7. Specifically, Semtech alleged Plaintiffs misappropriated thirty-one (31) trade secrets. *See id.* (asserting Counterclaims); Dkt. 21 (specifying trade secrets). On November 21, 2018, Semtech filed a Motion for Preliminary Injunction (Dkt. 14), wherein Semtech sought to enjoin Plaintiffs from misappropriating Semtech's thirty-one (31) trade secrets and violating the confidentiality agreements executed by Individual Plaintiffs and Semtech. *See* Dkt. 14.

On December 21, 2018—one month after filing its Motion for Preliminary Injunction—Semtech published the following press release, titled "Semtech Files Claims Against Spark Connected, Ken Moore, Emanuel Stingu, and Ruwanga Dassanayake," on its website:

> **CAMARILLO, Calif., Dec. 21, 2018** — Semtech Corporation (Nasdaq: SMTC), a leading supplier of high performance analog and mixed-signal semiconductors and advanced algorithms, announced that on November 16, 2018, it filed Counterclaims against Spark Connected, LLC ("Spark") and three current Spark employees who were formerly employed by Semtech:
>
> Ken Moore
> Emanuel Stingu
> Ruwanga Dassanayake
>
> Semtech alleges in its Counterclaims "a pattern of conduct in which Moore and Spark have improperly competed with Semtech, solicited Semtech employees, encouraged them to retain and disclose Semtech's confidential information and trade secrets, and used such information and trade secrets to compete directly with

2

Semtech in the wireless power market." Semtech alleges the following causes of action:

- Spark and each of the three former Semtech employees violated federal and state law by misappropriating Semtech's technical and business trade secrets related to wireless charging;
- Mr. Moore breached provisions of agreements he has with Semtech, including non-competition, non-solicitation, and confidentiality provisions;
- Messrs. Stingu and Dassanayake breached confidentiality provisions of agreements they have with Semtech;
- Messrs. Moore, Stingu, and Dassanayake violated their fiduciary duties to Semtech; and
- Spark and Messrs. Moore and Stingu improperly interfered with Semtech's contractual relations.

"Semtech intends to take all actions necessary to vigorously protect its intellectual property rights," said Mohan Maheswaran, Semtech's President and Chief Executive Officer.

Those actions include seeking assistance from the Court. Shortly after Semtech filed its Counterclaims, on November 21, 2018, Semtech also filed a Motion for Preliminary Injunction that asks the Court to, among other things, stop Spark and Moore from conducting business that unfairly competes with Semtech and stop Spark and Messrs. Moore, Stingu, and Dassanayake from doing any further work that misappropriates Semtech's trade secrets. Semtech submitted with that Motion a Declaration from a computer forensics expert that describes the current results of his ongoing investigation.

The action is pending in the United States District Court for the Eastern District of Texas, Case No. 4:18-cv-00748. Copies of Semtech's Counterclaims and its Motion for a Preliminary Injunction can be accessed here:

- https://www.semtech.com/uploads/documents/Semtech_Corporation_Motion_for_Preliminary_Injunction.pdf
- https://www.semtech.com/uploads/documents/Semtech_Corporation_Answer_Affirmative_Defenses_and_Counterclaims.pdf

(the "Press Release") Dkt. 300-1.

On May 8, 2019, prior to the hearing regarding Semtech's Motion for Preliminary Injunction, Semtech filed an Amended Answer and Counterclaims (Dkt. 131), in which Semtech no longer asserted the following claims: that Spark and Moore breached a fiduciary duty owed to Semtech, that Individual Plaintiffs breached their non-solicitation agreements, and that Plaintiffs

tortiously interfered with Semtech's contractual relations. *Compare* Dkt. 7 at 23–41 (initial Answer and Counterclaims) *with* Dkt. 131 at 23–38 (Amended Answer and Counterclaims). The same day, Semtech filed a response to Plaintiffs' pending Motion for Partial Summary Judgment, wherein Semtech represented it no longer asserted that Plaintiffs misappropriated nineteen (19) of the thirty-one (31) trade secrets originally asserted in Semtech's Counterclaims. *See* Dkt. 134 at 7. Semtech further narrowed its trade secret claims to four (4) alleged trade secrets after the Court denied Semtech's Motion for Preliminary Injunction. *See* Dkt. 289 at 8. Because Semtech has dropped multiple Counterclaims and trade secrets, Plaintiffs allege, as of February 27, 2020, Semtech has not "retracted or corrected the press release and has continued to publish that press release on its website" in "bad faith." *See id.* at 9; Dkt. 310.

Plaintiffs filed their Second Amended Complaint (Dkt. 289) on December 4, 2019, wherein Spark asserts claims against Semtech for business disparagement and tortious interference with business relations. *See id.* at 14–17. Spark bases its business disparagement and tortious interference claims on both Semtech's Press Release and remarks Semtech allegedly made to Shanghai Magway Magnetic Co. Ltd. ("Magway"), Spark's potential business partner. *See id.*[1]

On February 5, 2020, Semtech filed the Motion, arguing that Spark's business disparagement and tortious interference claims based on the Press Release should be dismissed

---

[1] In their Second Amended Complaint, Plaintiffs allege they met with management at Magway regarding a business proposal. *See* Dkt. 289 at 4. Around the same time, a Semtech representative allegedly met with Magway in an attempt "to sell Magway on a wireless charging solution for an under-counter wireless charging system." *Id.* at 4. Plaintiffs allege the Semtech representative "warned Magway's representatives not to do business with Spark because Semtech was planning to take legal action against Spark, because Semtech believed that Spark had taken Semtech's intellectual property." *Id.* at 4. Plaintiffs claim this "interference" was "the primary reason that Magway did not enter into an agreement with Spark." *Id.* at 15. Plaintiffs further allege Semtech has made similar false statements to other potential customers and vendors of Spark to support their business disparagement and tortious interference claims. *See id.* at 15, 17.

pursuant to the judicial proceedings privilege.[2] *See* Dkt. 299 at 5. Semtech's Motion does not argue the privilege applies to the alleged disparaging statements made by Semtech to Magway. *See id.* Spark then filed its response (Dkt. 310), to which Semtech filed its reply (Dkt. 320), and Spark filed a notice of supplemental authority (Dkt. 331).

On September 1, 2020, the Court heard oral argument regarding the Motion at the Hearing. *See* Dkt. 332.

## II.    LEGAL STANDARD

A party may seek dismissal in a pretrial motion based on any of the defenses set out in Rule 12(b) of the Federal Rules of Civil Procedure. FED. R. CIV. P. 12(b); *see also Albany Ins. Co. v. Almacenadora Somex*, 5 F.3d 907, 909 (5th Cir. 1993). Rule 12(b)(6) provides that a party may move for dismissal of an action for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). The court must accept as true all well-pleaded facts contained in the plaintiff's complaint and view them in the light most favorable to the plaintiff. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). A claim will survive an attack under Rule 12(b)(6) if it "may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007). In other words, a claim may not be dismissed based solely on a court's supposition that the pleader is unlikely "to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Id.* at 563 n.8. However, courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

---

[2] At the Hearing, Semtech stated that it filed the Motion as a motion to dismiss, or in the alternative, a motion for summary judgment, to ensure the Court would consider the Press Release. *See* Dkt. 332. As the Court finds the Press Release is central to Spark's business disparagement and tortious interference claims, the Court need not consider the Motion as a motion for summary judgment to consider the Press Release. *See* FED. R. CIV. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented . . . the motion must be treated as one for summary judgment.").

When considering a motion to dismiss, the court's review is limited to the complaint, any documents attached to the complaint, and any document attached to the motion to dismiss that are central to the claim and referenced by the complaint. *See Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000)).

## III.   ANALYSIS

### A.   JUDICIAL PROCEEDINGS PRIVILEGE

The judicial proceedings privilege "has been a part of Texas law for over 100 years." *Helfand v. Coane*, 12 S.W.3d 152, 157 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). Although Texas courts describe the privilege under several labels—"absolute immunity privilege,"[3] "the privilege of in court communication,"[4] and "judicial communication privilege"[5]—they often cite the same animating principle: "Communications in the due course of a judicial proceeding will not serve as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made." *See, e.g.*, *James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982); *see also* Boyd Mangrum, *Retaliatory Lawsuits and Texas's Judicial Proceedings Privilege*, 22 REV. LITIG. 541, 543–44 (2003). "This privilege extends to any statement made by the judge, jurors, counsel, parties or witnesses, and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case." *James v. Brown*, 637 S.W.2d at 916–17.

Although the Texas Supreme Court has held that negligence and malice have no bearing on the privilege's application, *see James v. Brown*, 637 S.W.2d at 916, some Texas appellate courts

---

[3] *Lombardo v. Traughber*, 990 S.W.2d 958, 960 (Tex. App.—Beaumont 1999, pet. denied).
[4] *Bird v. W.C.W.*, 868 S.W.2d 767, 772 (Tex. 1994).
[5] *Laub v. Pesikoff*, 979 S.W.2d 686, 689 (Tex. App.—Houston [1st Dist.] 1998, pet. denied).

have nevertheless considered the speaker's subjective intent and the statement's objective relationship to the judicial proceeding. *See, e.g.*, *Landry's, Inc. v. Animal Legal Def. Fund*, 566 S.W.3d 41, 57–61 (Tex. App.—Houston [14th Dist.] 2018, pet. filed) (analyzing a notice letter, press releases, statements to media, website posts, Facebook posts, and tweets under subjective and objective prongs); *Russell v. Clark*, 620 S.W.2d 865, 868–69 (Tex. App.—Dallas 1981, writ ref'd n.r.e.) (analyzing attorney's letter to potential defendant under objective prong); *Marble Ridge Cap. LP v. Neiman Marcus Grp., Inc.*, No. 05-19-00443-cv, 2020 WL 5814487, at *11 (Tex. App.—Dallas Sept. 30, 2020) (analyzing press releases about anticipated litigation under subjective prong).

Based on the Court's review of Texas law, Texas courts apply different legal tests based on a communication's timing. If the statement is made *before* a case's initiation, Texas courts examine the speaker's subjective intent and the statement's objective relationship to the judicial proceeding. *See, e.g.*, *BancPass, Inc. v. Highway Toll Admin., LLC*, 863 F.3d 391, 402–05 (5th Cir. 2017) (holding privilege did not apply because letters sent to third parties lacked a relationship to the contemplated legal proceeding); *Daystar Residential, Inc. v. Collmer*, 176 S.W.3d 24, 27–28 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (holding privilege applied because attorney's statements to newspapers "were, based in part, on his beliefs of how the new information would affect his suit").

Texas courts conduct a slightly different inquiry when the statement is made while a case is pending. If a case has already begun, Texas courts make a preliminary determination: If an out-of-court communication summarizes or quotes the judicial proceeding, such as press releases, the judicial proceedings privilege applies, and the inquiry ends there. *See, e.g.*, *Dallas Indep. Sch. Dist. v. Finlan*, 27 S.W.3d 220, 239 (Tex. App.—Dallas 2000, pet. denied), *cert. denied*, 534 U.S. 949

(2001) (holding privilege protected press release announcing a school district had, on that day, sued former board of trustees members); *Bennett v. Computer Assoc. Int'l, Inc.*, 932 S.W.2d 197, 201 (Tex. App.—Amarillo 1996, writ denied) (noting privilege protects pleadings delivered to media); *Allstate Ins. Co. v. Plambeck*, No. 3-08-cv-0388-M-BD, 2012 WL 2130982, at *6 (N.D. Tex. Jan. 4, 2012) (finding privilege protected news release summarizing allegations); *Invistà S.a R.L. v. Frontech, Inc.*, No. H-10-2100, 2011 WL 13249418, at *6 (S.D. Tex. July 29, 2011) (finding privilege protected press release containing "a basic description of the allegations"). In other words, if a lawsuit has already commenced, Texas courts do not delve into the subjective intent motivating the creation of such press releases. As one court reasoned, the privilege protects press releases that "largely mirror[] the complaint and add[] no allegations or factual information not already contained" because they "relate[] to" a court proceeding. *Fringe Benefit Grp. Inc. v. FCE Benefit Admin. Inc.*, No. A-18-cv-369-LY, 2018 WL 6728486, at *4 (W.D. Tex. Dec. 21, 2018), *report and recommendation adopted*, No. 1:18-cv-369-LY, 2019 WL 2563833 (W.D. Tex. Mar. 19, 2019). Thus, the privilege protects summaries and copies of proceedings, even if they are sent to numerous media sources. *See Charalambopoulos v. Grammer*, No. 3:14-cv-2424-D, 2015 WL 2451182, at *2–3 (N.D. Tex. May 22, 2015) (finding privilege protected defendant when her publicist distributed copies of her restraining order and photographs to "numerous" media sources); *see also Riley v. Ferguson*, No. 01-98-00350-CV, 1999 WL 191654, at *3 (Tex. App.— Houston [1st Dist.] 1999, pet. denied) (holding privilege protected copies of court filings sent to condominium neighbors and condominium office).

If the out-of-court communication made during the pendency of the litigation comments on the proceedings—beyond mere summary or description—Texas state courts examine the statement's relationship to the case and the subjective intent of the speaker. *See, e.g., Knox v.*

*Taylor*, 992 S.W.2d 40, 53 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding privilege would have protected copies of lawsuit sent to third parties, but a three-page memo with false, libelous information affixed to the copies destroyed the privilege); *Ross v. Heard*, No. 04-04-0110-CV, 2005 WL 357032, at *3 (Tex. App.—San Antonio Feb. 15, 2005, no pet.) (holding the privilege protected a letter with defamatory statements affixed to a copy of the pleadings); *see also Charalambopoulos v. Grammer*, No. 3:14-cv-2424-D, 2017 WL 606639, at *1, *11–13 (N.D. Tex. Feb. 15, 2017) (denying summary judgment because privilege might not protect tweets commenting on restraining order and sent to 198,000 followers). Though there has not been an authoritative ruling on the issue, the judicial proceedings privilege has protected comments and elaborations if they bear "some relation" to the proceeding. *See Landry's Inc.*, 566 S.W.3d at 57 n.9 (citing *Shell Oil Co. v. Writt*, 464 S.W.3d 650, 654–55 (Tex. 2015)); *see also Accresa Health LLC v. Hint Health Inc.*, No. 4:18-cv-00536, 2020 WL 4644459, at *39 (E.D. Tex. Mar. 19, 2020) (finding "some relation" requires recipient to have a "cognizable legal interest" in the pending litigation) ; *Allstate Ins. Co.*, 2012 WL 2130982, at *6 (finding a statistic in a press release, not mentioned in the pleadings, is protected because it "clearly bears some relation to the lawsuit").

Applying the legal precedent set forth above, the Court finds the judicial proceedings privilege protects the Press Release. Semtech published its Press Release approximately one month after it filed the Counterclaims against Plaintiffs. *See* Dkt. 300-1. The Press Release quotes and accurately summarizes the pleadings at the time of publication:

> Semtech alleges in its Counterclaims "a pattern of conduct . . . ." Semtech alleges the following causes of action . . . . "Semtech intends to take all actions necessary to vigorously protect its intellectual property rights," said Mohan Maheswaran, Semtech's President and Chief Executive Officer. . . . The action is pending in the United States District Court for the Eastern District of Texas, Case No. 4:18-cv-00748. Copies of Semtech's Counterclaims and its Motion for a Preliminary Injunction can be accessed here:

- https://www.semtech.com/uploads/documents/Semtech_Corporation_Motion_ for_Preliminary_Injunction.pdf
- https://www.semtech.com/uploads/documents/Semtech_Corporation_Answer _Affirmative_Defenses_and_Counterclaims.pdf

*Id.* Because Texas state courts, as well as district courts in the Fifth Circuit, have repeatedly protected out-of-court communications that accurately summarize pending proceedings, *see, e.g.*, *Finlan*, 27 S.W.3d at 239 (state court); *Charalambopoulos*, 2015 WL 2451182, at *3 (federal district court), the Court finds Semtech's Press Release is similarly protected.

## B.    SPARK'S BAD FAITH ARGUMENT

Spark contends Semtech asserted Counterclaims against it and published the Press Release in bad faith. *See* Dkt. 289 at 7–10, 16–17. Specifically, Spark argues Semtech's "specious" Counterclaims initially alleged Spark misappropriated thirty-one (31) trade secrets, and Semtech subsequently reduced them to four (4). *See id.* at 8–9. Spark further alleges Semtech asserted the Counterclaims "in bad faith to damage the business of Spark" and Semtech's "failure to remove and correct the false statements made in its December 21, 2018 press release" further evidence Semtech's bad faith. *See id.* at 9. Allegedly, "[t]hese publications include false and misleading statements regarding claims that Semtech is no longer asserting, including allegations concerning breaches of non-solicitation provisions." *See id.* Spark further alleges it lost actual and potential customers "specifically because" of the Press Release. Dkt. 289 at 10. The Court addresses the Press Release first, the alleged "bad faith" trade secrets second, and the alleged "bad faith" Counterclaims third.

### 1.    Semtech's Press Release

As aforementioned, so long as a press release echoes the pleadings and accurately describes the case thus far, neither state nor federal courts attempt to discern the intent behind its publication. *See Finlan*, 27 S.W.3d at 239 (protecting a press release without inquiring into intent); *Hill*, 877

S.W.2d at 783 (same); *Allstate Ins. Co.*, 2012 WL 2130982, at *6 (same); *Invistà*, 2011 WL 13249418, at *6 (same); *Charalambopoulos*, 2015 WL 2451182, at *3 (same). But even if bad faith was a factor, the bad faith narrative Spark describes omits important context.

At the time of its publication, the Press Release accurately described Semtech's Counterclaims and request for preliminary injunction. Spark does not allege Semtech republished (or otherwise distributed) the Press Release *after* Semtech dropped certain Counterclaims and/or the Court denied Semtech's Motion for Preliminary Injunction. Rather, Semtech published the Press Release one month after filing its claims for relief but before the pleadings further evolved. Nothing about the timing, content, and context of the Press Release destroys the privilege.

Further, nothing about the Press Release's continued presence on Semtech's website implicates destroying the privilege. In its Second Amended Complaint, Spark alleges:

> Semtech's press release has been and still is one of the first things to come up on a Google search for 'spark connected.' . . . Semtech's bad faith is further evidenced by its failure to remove and correct the false statements made in its December 21, 2018 press release. . . . Semtech has not retracted or corrected the press release and has continued to publish that press release on its website, including the links to Semtech's outdated original complaint and original motion for preliminary injunction. These publications include false and misleading statements regarding claims that Semtech is no longer asserting.

Dkt. 289 at 8, 9. But the Press Release was not false or misleading *at the time of publication*, which, under Texas law, appears to be the legal test applicable to press releases. *See Finlan*, 27 S.W.3d at 239 (protecting a press release published the same day a lawsuit was filed); *Allstate Ins. Co.*, 2012 WL 2130982, at *1–2, *6 (same); *Invistà*, 2011 WL 13249418, at *6 (same, but the day after the lawsuit was filed). In fact, the Press Release was an accurate snapshot, reflecting the litigation's state at the time it was posted. Put another way, the Press Release purports only to be news of the moment—at the time of publication, distinguishable from other statements on a website, such as a "Product Description" page, which a reader assumes to be true every time she

accesses it. Although the information contained in the Press Release no longer reflects the current state of litigation, the Press Release is accurate insofar as it reflects the case's status on December 21, 2018—the time of the Press Release's posting.

Further, Spark cites no authority to support its argument that Semtech had a legal obligation to remove the Press Release as soon as it became "outdated." Indeed, if such an obligation were to exist, innumerable individuals and entities may be liable for business disparagement and tortious interference with business relations. After all, it is common practice for companies to issue press releases on their websites and never revisit them again—no matter how outdated they become. Similarly, newspaper websites continue to provide access to news stories after they are no longer current—older news stories represent the current events as they stood when a story was published. Even the Court continues to provide public access to moot filings, such as Spark's original Complaint (Dkt. 1). In essence, Spark argues that those who maintain live websites must continually update, annotate, and/or recontextualize their past statements concerning ongoing judicial proceedings. No cited legal authority imposes such a burdensome demand.

Spark's allegations merely show that Semtech published a press release on its website, which accurately reflected the case's status at that point, quoted from the pleadings, and cited to the docket. Spark has not alleged Semtech disseminated the Press Release to Spark's potential business customers after Semtech narrowed its trade secrets and Counterclaims. Skewing the facts in this manner would present a different legal question altogether. On the face of Spark's Second Amended Complaint, the Press Release is protected by the judicial proceedings privilege.

### 2.      Semtech's Trade Secrets Reductions

Nor is the Court persuaded by Spark's argument regarding Semtech's "bad faith" trade secrets. On November 16, 2018, Semtech filed its Answer and seven (7) Counterclaims. *See* Dkt.

7. Five days later, Semtech filed its Motion for Preliminary Injunction, wherein it identified thirty-one (31) trade secrets it sought to protect. *See* Dkts. 14, 21. While Spark may find Semtech's enumeration of trade secrets "specious," at the inception of litigation, asserting thirty-one (31) trade secrets may have been reasonable. In seeking to enjoin the misappropriation of trade secrets, it is reasonable for the movant to assert all legally cognizable trade secrets at the outset of litigation.

Indeed, so long as Semtech reasonably believed its Counterclaims and Motion for Preliminary Injunction had evidentiary support and were warranted by existing law, the Federal Rules of Civil Procedure required Semtech to assert all legally cognizable trade secrets, or risk waiving such claims over them altogether. *See* FED. R. CIV. P. 11(b)(1)–(3) (requiring attorneys to certify pleadings are not presented for an improper purpose, are warranted by existing law, and are supported by evidence or will likely have evidentiary support); FED. R. CIV. P. 13(a) ("A pleading *must* state as a counterclaim *any* claim that—at the time of its service—the pleader has against an opposing party if the claim arises out of the same transaction or occurrence and does not require adding another party over whom the court cannot acquire jurisdiction.") (emphasis added); *see also Lightning Lube, Inc. v. Witco Corp.*, 144 F.R.D. 662, 669 (D.N.J. 1992) ("The filing of [a] Counterclaim itself [is] not an act of bad faith."). Because Semtech's counsel signed the Answer, Affirmative Defenses, and Counterclaims (Dkt. 7), the Motion for Preliminary Injunction (Dkt. 14), and the Notice specifying the trade secrets (Dkt. 21), the Court will presume Semtech complied with its obligations under Rule 11, and find Semtech's initial set of thirty-one (31) trade secrets were not asserted in bad faith. *Cf. Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 422–23 (1978) (advising courts to "resist the understandable temptation to engage in *post hoc* reasoning" to find an action "must have been unreasonable or without foundation" when analyzing bad faith under 28 U.S.C. § 1927) (italics original).

Similarly, Semtech's reduction of the thirty-one (31) trade secrets to four (4) must also be considered in context, devoid of *post-hoc* reasoning. On May 8, 2019, Semtech notified the Court it no longer asserted Plaintiffs misappropriated nineteen (19) of the thirty-one (31) trade secrets, leaving only twelve (12) trade secrets in dispute. *See* Dkt. 134 at 7. And by December 4, 2019, the number of trade secrets had been reduced from twelve (12) to four (4). *See* Dkt. 289 at 8. But the first reduction occurred approximately six (6) months after Semtech identified the initial thirty-one (31) trade secrets. Significant amounts of discovery relating to the preliminary injunction occurred during that time. *See, e.g.*, Dkt. 22-1 (interrogatories sent to Spark); Dkt. 22-2 (interrogatories sent to Moore); Dkt. 22-3 (interrogatories sent to Stingu); Dkt. 22-4 (interrogatories sent to Dassanayake); Dkt. 49-2 (transcript of Moore's deposition); Dkt. 49-10 (transcript of Dassanayake's deposition); Dkt. 55 (declaration of Semtech's expert witness); Dkt. 88 (declaration of Plaintiffs' expert witness); Dkt. 94 (declaration that Plaintiffs have produced more than 600,000 pages of documents as of April 4, 2019); Dkt. 95-4 (text message screenshots); Dkt. 95-26 (Semtech's response to Plaintiffs' first set of interrogatories); Dkt. 95-28 (Semtech's responses to Plaintiffs' first ten (10) requests for document production); Dkt. 124 (supplemental declaration of Semtech's expert witness). Given the litigation activity that transpired, it is reasonable that, post-discovery, Semtech would narrow and specify the trade secrets it alleges were misappropriated.

So too with Semtech's second reduction. Over the course of the two-day preliminary injunction hearing, Semtech zealously argued the remaining twelve (12) trade secrets were misappropriated. *See* Dkts. 157, 158. On the second day of the hearing, the Court noted a preliminary opinion that some of the trade secrets, as drafted, appeared broad and vague, stating "if the Court were to enter some type of preliminary order, the Court would request that those trade

secrets be narrowed down." Dkt. 185 at 336–37. The Court did not enter a preliminary order, but Semtech nonetheless subsequently reduced the number of trade secrets at issue by eight (8), bringing the number from twelve (12) to four (4). *See* Dkt. 289 at 9.

Semtech's actions regarding the eight (8) dropped trade secrets—conducting discovery, fervently arguing in support of the claims at the preliminary injunction hearing, and reducing the allegations upon a preliminary opinion from the Court—does not, without more, evidence bad faith.

### 3.     Semtech's Counterclaim Reductions

The Court reaches a similar conclusion with respect to Semtech's Counterclaims. Between Semtech's initial Answer and Counterclaims (Dkt. 7) and its Amended Answer and Counterclaims (Dkt. 131), Semtech no longer asserts the following causes of action: that Spark and Moore breached a fiduciary duty owed to Semtech; that Individual Plaintiffs breached their non-solicitation agreements; and that Plaintiffs tortiously interfered with Semtech's contractual relations. *Compare* Dkt. 7 at 23–41 *with* Dkt. 131 at 23–38. As with the first reduction of trade secrets, by the time Semtech filed its Amended Answer and Counterclaims, nearly half a year had passed and significant amounts of discovery activity had taken place *See, e.g.*, Dkts. 22-1, 22-2, 22-3, 22-4, 49-2, 49-10, 55, 88, 94, 95-4, 95-26, 95-28, 124. Therefore, even if bad faith should be considered as a factor in analyzing the judicial proceedings privilege, as applied to the Press Release, there is no evidence of bad faith in this matter.

### C.     SPARK'S CITED AUTHORITIES

Spark cites seven cases to support its argument. *See* Dkt. 310 at 5–7. After reviewing the cited authorities, the Court finds these cases are either distinguishable or do not support Spark's argument. The Court reviews Spark's cited cases below.

Spark cites *De Mankowski v. Ship Channel Dev. Co.*, 300 S.W. 118 (Tex. App.—Galveston 1927, no writ), to support the proposition that "Texas courts have not extended the judicial proceedings privilege to such out-of-court actions." Dkt. 310 at 5. Spark's reliance on *De Mankowski* oversimplifies the case's holding. In *De Mankowski*, a company made two averments on appeal: (1) the plaintiff made slanderous statements to individuals prior to initiating suit; and (2) the plaintiff brought his lawsuit with the intention of "materially decreas[ing] the volume of [the company's] business and the amount of its profits." *See* 300 S.W. at 121. The record showed that the plaintiff told numerous individuals the company was "broke," unable to fulfill contracts, "the directors were mere figureheads," the officers were "a bunch of crooks," "the company was going busted," and the company was "not able to meet certain checks coming in." *Id.* at 121. The court held the slanderous statements in plaintiff's pleadings were "absolutely privileged," but the out-of-court statements about the company's insolvency and lack of integrity were not. *Id.* at 122–23. Ultimately, the court did not address the company's argument that bad faith could destroy the privilege:

> Under a fair construction of [the company's] pleading, . . . [the company's] claim for damages **is not based upon the bringing of the suit** by the [plaintiff], nor upon the false statements contained in his petition, but upon the [plaintiff's] slanderous statements made to the persons named in [the company's] pleadings. . . . [The company's] pleading, in the absence of a special exception, being entitled to every reasonable intendment, we think should be construed as basing its cause of action upon the defamatory statements concerning [the company] made by [the plaintiff] to the various persons named in the pleading, and **not upon the bringing by [plaintiff] of this suit against [the company], nor the making in his petition** of similar defamatory statements.

*Id.* at 122 (emphasis added). Accordingly, *De Mankowski* does not support Spark's position for two reasons. First, the *De Mankowski* court declined to hold that litigation initiated in bad faith could destroy the privilege. *Id.* Second, *De Mankowski*'s actual holding relates to disparaging statements that exceeded quoting or summarizing the pleadings. *Id.* Thus, *De Mankowski*'s holding

16

does not compel the Court to find that a press release, limited to quoting and summarizing the pleadings, should fall outside of the privilege's protection.

Second, Spark cites *Champion Printing & Copying LLC v. Nichols*, No. 03-15-00704-CV, 2017 WL 3585213 (Tex. App.—Austin Aug. 18, 2017, pet. denied). *See* Dkt. 310 at 5–6. In *Champion Printing*, the court held the privilege did not protect four Facebook posts and three emails discussing a pending lawsuit. 2017 WL 3585213, at *17. This case is distinguishable. The communications in *Champion Printing* involved comments and elaborations upon a pending proceeding—not a press release that merely quotes court documents and accurately describes the case's current status at the time of its issuance. *Id.*

Third, Spark quotes a footnote in *Bennett v. Computer Assocs. Int'l, Inc.*, 932 S.W.2d 197 (Tex. App.—Amarillo 1996, writ denied), *see* Dkt. 310 at 5, which provides, "[t]he privilege, however, does not cover press conferences." 932 S.W.2d at 201 n.4. But the facts in this case involve a single static press *release*—not a press *conference*. *Bennett* is not responsive to the facts before the Court.

Fourth, Spark cites *HMC Hotel Props. II Ltd. P'ship v. Keystone-Tex. Prop. Holding Corp.*, No. 04-10-00620-CV, 2011 WL 5869608 (Tex. App.—San Antonio, Nov. 23, 2011). *See* Dkt. 310 at 5. *HMC Hotel Properties* stands on questionable grounds. In *HMC Hotel Properties*, the court held the privilege does not protect out-of-court statements by non-attorneys "[b]ecause the extension of the privilege to out-of-court statements is based on the adoption of section 586 of the Restatement (Second) of Torts (which only pertains to communications by attorneys)." 2011 WL 5869608 at *15, *rev'd on other grounds*, 439 S.W.3d 910 (Tex. 2014). However, four years later, the Texas Supreme Court cited Section 587 of the Restatement to hold the privilege protects statements of a non-attorney. *See Writt*, 464 S.W.3d at 654–55. Section 587 of the Restatement

provides "a party . . . is absolutely privileged to publish defamatory matter concerning another in communications . . . during the course and as part of, a judicial proceeding in which he participates, if the matter has some relation to the proceedings." Restatement (Second) of Torts § 587 (1977). Thus, *Writt* takes a broader view of the privilege, undermining Spark's argument. 464 S.W.3d at 654–55. Further, in *James v. Brown*, the Texas Supreme Court explicitly applied the privilege to a non-attorney. *See* 637 S.W.2d at 916–17 ("This privilege extends to any statement made by the judge, jurors, counsel, *parties* or witnesses.") (emphasis added). As the analysis articulated in *HMC Hotel Properties* has been called into question at the Texas Supreme Court level, the Court is not convinced that it represents the most accurate assessment of current Texas law.[6]

Fifth, Sparks cites *Ross v. Heard*, No. 04-04-0110-CV, 2005 WL 357032 (Tex. App.—San Antonio Feb. 16, 2005, no pet.). *See* Dkt. 310 at 7. There, a lawyer sent a letter to a state agency, requesting that the agency avoid assigning one of its doctors to any of the lawyer's cases. *See Ross*, 2005 WL 357032, at *1. The lawyer alleged the doctor "misapplied or embezzled property in his role as independent executor of an estate," affixing a copy of the probate pleadings to the letter. *Id.* Because the agency was a quasi-judicial entity and because the lawyer did not circulate the letter to others, the court held the defamatory letter was not "so egregious as to negate the protections of the absolute privilege." *Id.* at *1–2.

Again, *Ross* does not directly support Spark's argument that the Press Release should not be protected, as circulating a letter to a quasi-judicial entity is not comparable to publishing a press release. Moreover, the letter at issue in *Ross* was found to be privileged. *Id.*

Sixth, Sparks cites *Levingston Shipbuilding Co. v. Inland W. Corp.*, 688 S.W.2d 192, 196–

---

[6] Notably, Texas Court of Appeals' opinion in *HMC Hotel Properties* was not designated for publication.

97 (Tex. App.—Beaumont 1985, writ ref'd n.r.e.). Dkt. 310 at 7. *Levingston* stands for the proposition that a plaintiff who maliciously files a lawsuit "grossly in excess of any damages that could be proved" and instructs his attorney to distribute the suit to the media could lose the privilege. 688 S.W.2d at 198. However, as another Texas appellate court has noted, "*Levingston* . . . has no support in the case law and is a deviation from the general rule." *Hill v. Herald-Post Publ'g Co., Inc.*, 877 S.W.2d 774, 783 (Tex. App.—El Paso 1994), *rev'd on other grounds*, 891 S.W.2d 638 (Tex. 1994). "[T]he mere delivery of pleadings in pending litigation to members of the news media does not amount to a publication outside of the judicial proceedings, resulting in a waiver of the privilege." *Id.* Because ample case law protects press releases that accurately summarize and quote judicial proceedings—at least at the time of publication—even if distributed to numerous media outlets, *see, e.g.*, *Charalambopoulos*, 2015 WL 2451182, at *2–3, the Court declines to follow the deviation from the general rule suggested in *Levingston*.

Lastly, Sparks cites *Burzynski v. Aetna Life Ins. Co.*, 967 F.2d 1063 (5th Cir. 1992). Dkt. 310 at 7. In *Burzynski*, an insurance company's legal representative sent letters to several entities, hoping to solicit discoverable information in a pending litigation. *See* 967 F.2d at 1065. The insurance company's adversary, a doctor, filed claims of business disparagement and tortious interference, alleging the letters were sent to injure him. *Id.* at 1066. The trial court held the letters were absolutely privileged. *Id.* at 1067. The Fifth Circuit affirmed in part, reversed in part, and remanded the case, holding the letters could have been sent in bad faith, which would have destroyed the privilege. *Id.* at 1069.

*Burzynski* applies to statements that are made *in addition to* summaries or copies of the pleadings. Semtech's Motion is limited to a press release that simply describes the nature of the lawsuit and quotes statements found in court filings. Accordingly, *Burzynski* is inapplicable to the

present matter.

While the Court must treat Spark's factual allegations in the Second Amended Complaint as true and view them in the light most favorable to Spark, *see Baker*, 75 F.3d at 196, the Court finds that the judicial proceedings privilege protects the Press Release. Spark's bad faith argument lacks sufficient legal support, and press releases that accurately summarize pending cases and quote the allegations therein have been consistently protected under Texas law. The Court, therefore, holds Semtech's Press Release is protected by the judicial proceedings privilege.

### D.  WHETHER FURTHER DISCOVERY IS NECESSARY

In its response to the Motion, Spark argues granting the Motion would be premature, as claims of privilege are fact-intensive, and thus, are better decided at the motion for summary judgment stage, after the parties have conducted some discovery. *See* 310 at 2–3 (citations omitted).

The pleadings before the Court show dismissal is proper, irrespective of additional discovery. Taking all of Spark's factual allegations as true, the Court finds the Press Release to be protected under the prevailing case law. Texas state courts and federal district courts in the Fifth Circuit have not examined intent and its role in creating or disseminating press releases when they accurately describe pending legal proceeding and/or quote from the pleadings. *See* Dkt. 289 at 7–10, 16–17 (Spark's allegations of bad faith); *Finlan*, 27 S.W.3d at 239 (protecting a press release without inquiring into intent); *Hill*, 877 S.W.2d at 783 (same); *Allstate Ins. Co.*, 2012 WL 2130982, at *6 (same); *Invistà*, 2011 WL 13249418, at *6 (same); *Charalambopoulos*, 2015 WL 2451182, at *3 (same).

Upon review of Plaintiffs' Second Amended Complaint (Dkt. 289), Spark's business disparagement and tortious interference claims are based on both the Press Release and Semtech's

alleged disparaging remarks to Magway regarding Spark. *See* Dkt. 289 at 15–17. As such, Semtech's Motion is **GRANTED** as to Spark's business disparagement and tortious interference claims based on the Press Release.

### IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court finds Semtech's Press Release is protected under the judicial proceedings privilege. Accordingly, Semtech's Motion to Dismiss, or in the Alternative for Partial Summary Judgment of, Spark Connected, LLC's Claims for Business Disparagement and Tortious Interference (Dkt. 299) is **GRANTED** as to Spark's business disparagement and tortious interference claims based on the Press Release. Spark's business disparagement and tortious interference claims based on allegations other than the Press Release remain pending.

**So ORDERED and SIGNED this 24th day of November, 2020.**

_____
KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE